# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2379
_____

Todd Karlen

*Plaintiff - Appellee*

v.

Jones Lang LaSalle Americas, Inc.

*Defendant - Appellant*

_____

No. 13-2835
_____

Todd Karlen

*Plaintiff - Appellant*

v.

Jones Lang LaSalle Americas, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 12, 2014
Filed: September 9, 2014

_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Following his termination from Jones Lang Lasalle, Americas, Inc., (JLLA), Todd Karlen sued JLLA for, *inter alia*, failure to pay him a commission on a deal that closed shortly after his departure. JLLA moved for summary judgment, and Karlen responded. The district court *sua sponte* granted summary judgment for Karlen and held that JLLA had wrongfully withheld commission payments; the district court consequently awarded Karlen the amount of the commission as well as statutory penalties for late payment under Minn. Stat. §§ 181.03, 181.13, and attorney's fees and costs under Minn. Stat. § 181.171. JLLA appeals the district court's order that it owed Karlen both a commission and statutory penalties. Karlen appeals the district court's reduction of his requested attorney's fees. Having jurisdiction under 28 U.S.C. § 1291, we reverse the district court's order granting summary judgment for Karlen and vacate the resulting award of attorney's fees and costs.

## I. Background

From May 2010 until January 2012, Karlen was employed as a leasing specialist for JLLA, a commercial real estate company. Karlen acted as a broker, locating and securing retail tenants for JLLA's clients. Karlen's original compensation structure consisted of an annual salary of $75,000 with the opportunity to earn an annual end-of-year bonus based on performance. In January 2012, JLLA changed its compensation structure for all employees to a salary plus commissions. Karlen's base salary was lowered to $60,000, but he had the opportunity to earn "up

to 30% of the leasing revenue" that he directly generated starting January 1, 2012. Karlen was also eligible to receive up to a 10% commission on leases secured by other sales representatives in his assigned territory.

Shortly after the compensation change, on January 31, 2012, Karlen was terminated for performance reasons. JLLA notes that from 2010 through the end of 2011, Karlen was consistently rated a low performer. At the time of his termination, Karlen was in the process of completing a lease deal with a tenant, Primebar: all substantive negotiations had been completed, and the final lease had been sent to Primebar for its signature. Karlen estimated that his 30% commission on the Primebar deal would have been worth $37,616.90. Primebar executed the proposed final lease on February 3—three days after Karlen was terminated.

Karlen contacted JLLA several times and demanded his commission on the Primebar transaction. JLLA maintained that while Karlen was not entitled to the commission following termination, JLLA was willing to pay the Primebar commission and possibly other commissions based on a protection list[1] of former clients, should those transactions occur within a certain period of time after termination. Both parties agree this is standard industry practice. On February 20, 2012, Karlen sent JLLA a protection list of the clients he had been working with and noted that he "expect[ed] to receive commissions on leases closed in the next 90 days." The only client on the list to have closed a transaction within the 90-day period was Primebar.

---

[1]According to the parties, it is common in the industry for a company and a terminated broker to develop and agree to a protection list of clients whose accounts the broker had been working on prior to termination. If any deal is completed with a client on the protection list within a certain amount of time following the termination, the terminated broker still receives some commission on the transaction.

On April 9, 2012, Karlen filed suit in Minnesota state court claiming to be owed a commission on the Primebar lease, as well as other commissions, a bonus for 2011, and reimbursement of certain business expenses. On May 5, 2012, JLLA removed the case to federal court.[2] After the start of the litigation, JLLA sent Karlen three checks representing 30% of the revenues JLLA received from the Primebar lease. The checks were dated May 4, 2012, June 1, 2012, and October 5, 2012. Karlen did not cash these checks. Instead, he contacted JLLA. JLLA informed Karlen that it would consider cashing the checks to be a settlement of any additional claims for more money from the Primebar lease. Karlen consequently returned the checks to JLLA.

Following extended discovery, JLLA moved for summary judgment on all claims. On May 23, 2013, the district court held a hearing on JLLA's motion and granted JLLA summary judgment on all claims except the Primebar commission. The district court, acting *sua sponte*, then granted summary judgment to Karlen on the remaining claim regarding the Primebar commission, concluding JLLA breached its contract with Karlen. The district court found JLLA owed Karlen a commission on the Primebar deal. The court also found that, by attaching conditions to the cashing of the commission checks, JLLA had "altered the method or procedures for payment" and thus committed "a violation of the applicable Minnesota statutes." The district court thus awarded Karlen $69,042 under Minn. Stat. § 181.03, double the Primebar commission value of $34,521. The district court also held that Karlen was entitled to average daily earnings for 15 days—$3,461.54—under Minn. Stat. § 181.13 for JLLA's failure to pay wages promptly. Finally, the district court ordered JLLA "to pay reasonable costs, disbursements, witness fees, and attorney fees" as required by Minn. Stat. § 181.171, which the court announced it would address in a separate order.

---

[2]Karlen is a citizen of Minnesota and claims damages in excess of $120,000. JLLA is a Maryland corporation with its principal place of business in Illinois.

Karlen then submitted his costs and attorney's fees to the district court. Karlen sought $2,018.22 in costs and $48,548.31 in attorney's fees. Finding the legal issues were "not particularly significant or complex" and that "[s]uccessful prosecution of this claim did not necessitate significant amounts of time, discovery or legal skill," the district court awarded $20,000 in attorney's fees and $2,018.22 in costs.

JLLA appeals the district court's order awarding Karlen both a commission and statutory penalties. Karlen appeals the district court's award of attorney's fees.

## II. Discussion.

"We review *de novo* the district court's grant of summary judgment, viewing the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Petroski v. H&R Block Enters., LLC, 750 F.3d 976, 978 (8th Cir. 2014). Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

JLLA argues that the district court erred in awarding a commission, wages, and statutory late payment penalties under Minn. Stat. §§ 181.03 and 181.13. We agree for two reasons: (1) JLLA did not owe Karlen a commission payment at the time of termination because commission payments were subject to at least two conditions precedent that had not yet been fulfilled; and (2) even if JLLA did eventually owe Karlen a commission (either under the employment contract or due to some other theory), any such amount would not have been owed until after termination, and therefore, Minn. Stat. §§ 181.03 and 181.13 do not apply.

## A. Commissions and Statutory Penalties

The Minnesota Payment of Wages Act provides statutory protection for the payment of wages and commissions owed to employees whose employment is terminated by their employers. Minn. Stat. §§ 181.01–.171. Minnesota law requires that "an employer . . . not alter the method of payment, timing of payment, or procedures for payment of commissions *earned through the last day of employment* . . . ." Minn. Stat. § 181.03 (emphasis added). Any employer "who violates this section is liable . . . for twice the amount in dispute." Id. Minnesota further provides that "[w]hen any employer employing labor within this state discharges an employee, the wages or commissions *actually earned* and unpaid *at the time of the discharge* are immediately due and payable upon demand of the employee." Minn. Stat. § 181.13 (emphasis added). If the employer fails to pay the wages and commissions owed "within 24 hours after demand, . . . the employer is in default." Id. For each day the employer is in default, the employee is entitled to another day of compensation, based on his average daily earnings, up to 15 days. Id.

We have found that Minn. Stat. § 181.13 "'is a timing statute, mandating not *what* an employer must pay a discharged employee, but *when* an employer must pay a discharged employee.'" Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 917 (8th Cir. 2013) (quoting Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 837 (Minn. 2012)). "The employment contract governs whether wages were 'actually earned and unpaid' for purposes of Minn. Stat. § 181.13." Chambers v. Travelers Co., 668 F.3d 559, 566 (8th Cir. 2012) (citing Lee v. Fresensius Med. Care, Inc., 741 N.W.2d 117, 127–28 (Minn. 2007)). Section 181.13 only applies if an employer owes an employee unpaid wages or commissions under the employment contract. Because Minn. Stat. § 181.13 creates a civil penalty, it must be strictly construed. Lee, 741 N.W.2d at 125–26 (interpreting Minn. Stat. § 181.13).

Section 181.03, similar to § 181.13, does not determine *what* an employer owes. The employment contract, not the statute, determines what commissions have been "earned through the last day of employment." Minn. Stat. § 181.03. Section 181.03 also provides for a penalty by allowing the recovery of double the commissions owed if an employer "alter[s] the method of payment, timing of payment, or procedures for payment of commissions." See Minn. Stat. § 181.03, sub. 3. Thus, like § 181.13, § 181.03 must be strictly construed. Cf. Lee, 741 N.W.2d at 125–26.

Therefore, "[t]o recover under [either] statute, the employee must establish an independent substantive legal right, separate and distinct from [§§ 181.03 and 181.13] to the particular wage claimed." Caldas, 820 N.W.2d at 837 (interpreting Minn. Stat. § 181.13). The terms of the employment contract determine what wages and commissions are "earned" and owing at the time of termination. Any such earnings may be "subject to conditions specified in the contract." Lee, 741 N.W.2d at 126. Under the terms of the applicable statutes, therefore, JLLA is only subject to penalties for failure to pay (or for altering the method of payment) if it owed Karlen a commission on the Primebar deal at the time of his termination. See Minn. Stat. §§ 181.03 and 181.13.

We conclude that JLLA did not owe Karlen a commission on the Primebar deal at the time of his termination. It is undisputed that the Primebar commission payments were subject to at least two conditions precedent, neither of which had been met at the time Karlen was terminated, and thus no commission had been "earned" or was owing under the employment contract at the time of his termination.

First, JLLA's leasing agents only earn commissions on revenue JLLA actually receives. Karlen agrees that the new compensation program was described to him in a January 27, 2012, "Compensation Change" memo; and the parties do not dispute that this memo was a part of the employment contract between JLLA and Karlen.

This memo provided that agents will no longer have a target bonus but will instead be eligible to earn "production based" commissions. Agents are "eligible for a production based incentive which includes commission payments of up to 30% of the leasing *revenue you directly earn*." (Emphasis added.) If for some reason JLLA does not receive revenue from its clients, then the agents would not be paid a commission.[3] This means that agents must wait to receive commissions (and even to know if they will receive a commission) until sometime after execution of a lease, when revenue is received. JLLA structures its leases so it receives payment from the property owners in two increments: one half of the payment owing immediately after a lease is executed and the other half when the retail tenant opens for business. The time period between when a lease is executed and when revenue is finally received may, at times, be substantial. In this case, the first payment on the Primebar lease did not arrive until May 2012, long after Karlen's termination.

Second, and perhaps more fundamentally, the Primebar lease was not executed until after Karlen was terminated. JLLA argues that any contractual expectation ended when Karlen was terminated.[4] We agree that execution of the lease was a critical condition to Karlen earning a commission. The Compensation Change memo expressly states that "Commission payment amounts are dependent upon the type of lease . . . and leasing agents involved in *executing* the deal." (Emphasis added.) Prior to termination, Karlen had, at most, an expectation of earning "up to 30%"

---

[3]The Compensation Change memo describes the eligible commissions as being "up to 30% of the leasing revenue you directly earn." The agreement is not clear whether the 30% is guaranteed on every transaction. We also note that the Compensation Change memo suggests that commission payments would not be paid prior to April 2012. It expressly states: "You will be eligible to receive the commission payments beginning in April, subject to your recourse draw being completely repaid."

[4]JLLA is careful to distinguish between contractual expectations prior to termination and its willingness to pay Karlen based on some other equitable theory.

commission should the Primebar lease be executed. This expectation lasted only as long as Karlen was employed with JLLA. Because Karlen had not finalized the Primebar lease prior to his termination, Karlen had no contractual entitlement to a commission at the time of his termination.[5] Thus, the failure of one or both of these conditions precedent means that JLLA did not owe Karlen any payment at the time of termination. As a result, JLLA did not breach its contract with Karlen such that statutory late payment penalties were owing pursuant to Minn. Stat. §§ 181.03 and 181.13.

Nevertheless, the district court found that JLLA owed Karlen a commission on the Primebar lease, and held that JLLA had improperly attached conditions to those payments thereby changing the method or terms of the payments. It is not entirely clear from the record under what theory the district court concluded that JLLA owed the commission; nor is it clear when exactly the commission was owed.[6] But even if JLLA eventually owed Karlen commission payments under a subsequent agreement or under some other equitable theory, we do not believe that Minn. Stat. §§ 181.03 and 181.13 may be interpreted so broadly as to provide penalties for late payment of commissions that were not owed under the employment contract prior to termination. By their terms, these two statutory provisions are limited to providing penalties for the delayed payment of amounts "earned through the last day of employment" and/or

---

[5]We note this might be a different case had Karlen been terminated in bad faith in an attempt to avoid paying a commission. However, at the summary judgment hearing, Karlen conceded he was not terminated in bad faith.

[6]JLLA maintains that the Primebar commission payments were not owed under the employment contract, which terminated on January 31, 2012, but were instead paid due to a later agreement made with Karlen following his termination. When JLLA eventually received revenue, JLLA issued checks to Karlen for the commission amounts. It is these payments that the district court held were insufficient, under Minn. Stat. §§ 181.03 and 181.13, due to restrictions that JLLA purportedly placed on cashing the checks.

"actually earned and unpaid at the time of discharge." Minn. Stat. §§ 181.03, 181.13. No such amounts were owed at the time of Karlen's discharge. As such, any amounts later owed are outside the scope of the statutes. Therefore, we conclude as a matter of law that Karlen was not owed either commissions or penalties based on a breach of contract theory.

In his appellate brief, Karlen admits that "[n]o agreement was ever reached between Karlen and Appellant JLL[A] post-termination . . . ." This admission forecloses his ability to proceed on remand under the theory that there was a post-termination agreement that was breached. Karlen also has not appealed the dismissal of his unjust enrichment and promissory estoppel claims. As such, JLLA is entitled to summary judgment.

## B. Attorney's Fees

Karlen appeals the district court's order awarding attorney's fees for a lesser amount than requested. As explained, Karlen is no longer a prevailing party entitled to attorney's fees and costs under Minn. Stat. § 181.171. At oral argument, Karlen's counsel agreed his appeal would be moot if we failed to affirm the ruling on the merits of the award. Given our reversal of the underlying award, we must also vacate the later order awarding costs and attorney's fees.

## III. Conclusion

For the reasons stated above, we reverse the district court's order granting summary judgment in favor of Karlen on his breach of contract claim involving the Primebar commission and vacate the district court's order granting Karlen attorney's fees and costs.

JLLA's brief on appeal acknowledges that after Karlen's separation from employment, the company agreed to pay Karlen a thirty-percent commission on the Primebar deal. At oral argument, counsel for JLLA likewise advised the court that Karlen is "entitled to a commission on the Primebar deal" of $34,521. The court expects that JLLA will follow through on its representations.

_____