# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2578
_____

Todd D. Auge

*Plaintiff - Appellant*

v.

Fairchild Equipment, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 16, 2020
Filed: December 16, 2020

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Todd Auge sold tractors and other industrial equipment for Fairchild Equipment, Inc. He claims that the company failed to pay him the commissions he was owed. On summary judgment, the district court concluded that he was owed nothing more. We affirm in part, reverse in part, and remand for further proceedings.

I.

Auge, an experienced industrial-equipment salesman, started with Fairchild in 2013. According to the parties' "2013 Pay Program," Auge earned a base salary of $50,000 and a commission of 30% on the gross profits from most new equipment sales.

The one exception was for JCB equipment, which he was not authorized to sell on his own. For those, his commission was initially set at 5–10% of gross profits, depending on his level of involvement in the sale, but it rose to 30% after he completed a training program at Fairchild's corporate headquarters in the middle of 2016.

Early the following year, Auge made a more than $2 million, "record-setting" deal for JCB "Fastrac" tractors with Birds Eye Foods. Then Auge's compensation changed yet again. Under the parties' "2017 Pay Program," the following formula, as relevant here, applied:

- [Birds Eye] Foods[1] FastTrack [sic] commission:
  o 25% of gross profit money ($) booked in 2017. Remainder of un-booked gross profit will be re-examined annually.
  o 25% commission to be paid on booked gross profit in subsequent years until all of the gross profit for the original Fast Track [sic] deals are booked.

An email explained to Auge how the formula would work. Even though the gross profits on the Birds Eye Deal would eventually be $250,114, only $93,611 would be "booked" in June 2017. Based on these figures, he would receive a

---

[1]The agreement actually specified "Pinnacle Foods," not "Birds Eye Foods." But Pinnacle is Birds Eye's parent company, and the parties regularly referred to the two companies interchangeably.

commission of $23,402.75 (25% of $93,611) shortly, with the rest payable later, depending on whether Birds Eye purchased the tractors at the end of the lease term and how much warranty service was required.

Just eight days later, Auge abruptly quit. Although Fairchild deposited his commissions into his bank account, he demanded more. He believed he was entitled to a 30% commission on *all* anticipated gross profits, not just those "booked" in 2017. He also requested immediate payment on several "rental purchase option[s]," even though Fairchild's policy was not to pay commissions on these rent-to-own arrangements until the end of the rental term. In Fairchild's view, Auge lost those commissions once he quit.

When it became clear that Fairchild would not budge on his demands, Auge sued in state court for breach of contract and for alleged violations of the Minnesota Payment of Wages Act. Fairchild removed the case to federal district court, which dismissed the case on summary judgment.

II.

We review the district court's decision to grant summary judgment de novo. *Tonelli v. United States*, 60 F.3d 492, 494 (8th Cir. 1995). "Summary judgment [was] appropriate [if] the evidence, viewed in [the] light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party [was] entitled to judgment as a matter of law." *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) (quotation marks omitted).

A.

We begin with the dispute over the timing and amount of the commission on the Birds Eye deal. The first disagreement is over which agreement applied: the 2013 or 2017 Pay Program. The second is whether, under whichever agreement

applied, Fairchild should have immediately paid a commission on all anticipated gross profits. Everyone agrees that Minnesota law governs this diversity case. *See, e.g.*, *Ewald v. Wal-Mart Stores, Inc.*, 139 F.3d 619, 621 (8th Cir. 1998).

Although Auge's compensation changed during the relevant period, he does not seriously dispute that he agreed to the 2017 Pay Program. It unambiguously states that he was entitled to only "25% of gross profit money ($) booked" in that first year. The inclusion of a specific formula for the Birds Eye deal leaves no real doubt that the 2017 Pay Program applies here.

Auge has two counterarguments, but neither one overcomes this straightforward conclusion. The first is that the formula applies only to *future* sales of Fastrac tractors to Birds Eye, rather than to the existing deal. Oral Arg. at 30:04–30:50. One obvious problem with this interpretation is that the formula specifically refers to gross profit booked in 2017, and there is no suggestion in the record that there was some other deal looming. The other related problem is that the 2017 Pay Program refers to a singular "[Birds Eye] Foods FastTrack [sic] commission"—that is, the one for the deal that Auge had already made. *See Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) (interpreting a contract in accordance with "its plain and ordinary meaning").

Auge's second counterargument is based on the procuring-cause doctrine. The idea is that once a salesperson has completed negotiations, an employer cannot "deprive" him "of compensation for his . . . services," *Neumeier v. Sperzel*, 25 N.W.2d 651, 655 (Minn. 1946) (quotation marks omitted), absent an agreement that "stipulate[s] to the contrary," *Olson v. Penkert*, 90 N.W.2d 193, 201 (Minn. 1958). The trouble for Auge is that his pay was set by an agreement, the 2017 Pay Program, even if he now thinks it shortchanged him. *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 330 (Minn. 2004) (explaining that the procuring-cause doctrine "is only available whe[n] there is no contract remedy"). The procuring-cause doctrine, in other words, cannot save him from his own bad deal with

Fairchild.  *See id.* at 327 (explaining that what a salesperson is entitled to receive "depends on the exact agreement between the" parties).

B.

The rental purchase options are a different story.  All the 2017 Pay Program says about them is that "[n]o commissions" are "earned" unless they "result[] in [an] equipment sale."  It does not explain, however, what to do with the commissions if, as happened here, Auge was no longer with the company when his efforts eventually "result[ed] in [an] equipment sale."

With a lack of specific guidance on that point, both Fairchild and Auge quarrel about the meaning of another passage in the 2013 and 2017 Pay Programs.  Each declares, using slightly different language, that the parties' intent "[was] to outline the commission and compensation arrangement[] . . . for as long as [Auge]" remained an employee.

One interpretation of this passage is that it creates a condition precedent, requiring Auge to remain an employee to receive a commission.  *See Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 27 (Minn. 2018) (explaining that a condition precedent "calls for the performance of some act or the happening of some event after the contract is entered into, and upon the performance or happening of which [the promisor's] obligation is made to depend" (alteration in original and quotation marks omitted)).  The other is that, consistent with the procuring-cause doctrine, it just "outline[s]" his "compensation arrangement[]" for any deals he negotiated *while* he was an employee.  With "more than one reasonable interpretation" available, the contract is ambiguous on this point.  *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018).

The district court also concluded that the contract was ambiguous, but it still granted summary judgment to Fairchild based on the available extrinsic evidence.

*See Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn. 1982) (explaining that when there is an ambiguity in a contract, "courts may resort to extrinsic evidence"). Key to its conclusion was that the parties had agreed that "Fairchild [did] not pay commissions . . . on [rental purchase options] until the customer purchase[d] the equipment." But this undisputed fact is equally consistent with Auge's position that he *earned* a commission once the underlying rental agreement was reached, even if payment came later. With the extrinsic evidence potentially consistent with both interpretations, this breach-of-contract claim should have been submitted to a jury. *See Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005) (stating that unless the extrinsic evidence is "conclusive," the "construction" of an ambiguous contract is for the jury).

Not content to stop there, Auge believes the ambiguity in the contract should have led to judgment in his favor. He relies on the rule of *contra proferentem*: the idea that ambiguities should be resolved against the contract's drafter—here, Fairchild. *E.g.*, *Wick v. Murphy*, 54 N.W.2d 805, 809 (Minn. 1952). The Minnesota Supreme Court recently clarified, however, that *contra proferentem* applies only as a tiebreaker, "after an attempt" has been made to resolve the ambiguity through extrinsic evidence. *Staffing Specifix*, 913 N.W.2d at 694 (emphasis omitted). A jury could resolve this dispute either way without resorting to a tiebreaker, so Auge is not entitled to summary judgment.[2] *See id.* (explaining that a jury instruction must direct the jury to attempt to "determine the parties' intent" *before* construing ambiguous terms against the drafter).

---

[2]Nor does Auge's citation to *Hideaway, Inc. v. Gambit Invs. Inc.* get him very far. 386 N.W.2d 822, 824 (Minn. App. 1986). To be sure, *Hideaway* recognized that conditions requiring forfeiture should be stated unambiguously, because they are disfavored under Minnesota law. *Id.* But a condition precedent does not induce forfeiture. *See id.* (involving a condition *subsequent*). Indeed, Auge could not have forfeited commissions he had yet to earn.

Finally, Auge claims that withholding commissions violated the Minnesota Payment of Wages Act in two ways. First, Fairchild failed to comply with its statutory duty to pay him all "earned and unpaid" commissions by "the first regularly scheduled payday following" his "final day of employment." Minn. Stat. § 181.14 subdiv. 1(a). Second, it had no right to "alter the method of payment, timing of payment, or procedures for payment of commissions earned through the last day of employment after" he had "resigned." Minn. Stat. § 181.03 subdiv. 2. He relies on the same evidence and arguments as before.

The first statutory theory fails because, as we conclude above, Fairchild owed him nothing more on the Birds Eye deal under the 2017 Pay Program. Nor, even assuming he was entitled to commissions on the rental purchase options, did the duty to pay him arise "at the time [he] . . . resign[ed]." Minn. Stat. § 181.14 subdiv. 1(a). Rather, it came later, at the end of the rental term, only if the customer decided to purchase the equipment. *See Karlen v. Jones Lang LaSalle Ams., Inc.*, 766 F.3d 863, 869 (8th Cir. 2014) (explaining that the Minnesota Payment of Wages Act does not "provide penalties for late payment of commissions that were not *owed* under the employment contract prior to termination" (emphasis added)).

Auge fares no better under his second statutory theory. To the extent Fairchild changed "the method," "timing," and "procedures for payment" by switching to the 2017 Pay Program, it did so *before* Auge resigned, not "after."[3] Minn. Stat. § 181.03 subdiv. 2. Without a *post*-employment "alter[ation]" of some kind, this statutory claim also fails. *Id.*

---

[3]The same goes for Fairchild's decision to correct an accounting error on a post-resignation direct deposit into his bank account, because he knew before he resigned exactly how much the company owed him on the Birds Eye deal.

## III.

We accordingly affirm in part, reverse in part, and remand for further proceedings.

_____